# EXHIBIT
# 1

PARTNERSHIP AGREEMENT

This Partnership Agreement dated as of January 1, 1995 (the "Agreement"), is made by and among Suzanne Wright of Hingham, Massachusetts ("Wright") and William Robert Meara of Hingham, Massachusetts ("Meara"), hereafter referred to collectively as the "Partners" and each of whom is referred to as a "Partner."

WHEREAS, Wright and Meara wish to enter into an agreement pursuant to which they will jointly own, acquire, maintain, lease, sell, dispose of and otherwise deal with property located at 21 Martins Cove Road, Hingham, Massachusetts (the "Property"); and

WHEREAS, the parties wish to enter into this Partnership Agreement to set forth more fully their respective rights, obligations and duties with respect to the Property;

NOW, THEREFORE, for good and valuable consideration, including the mutual covenants set forth below, the receipt and sufficiency of which are hereby acknowledged, the parties hereto have agreed as follows:

## ARTICLE I.

### NAME AND PURPOSE

Section 1.1.  Name and Office

The Partnership has been and shall be conducted under the name of Martins Cove Realty Company.  The principal office of the Partnership shall be c/o Suzanne Wright, 21 Martin's Cove Road, Hingham, Massachusetts 02043 or such other place as the Partners may from time to time determine.

Section 1.2.  Purpose

The purpose and business of the Partnership is to acquire, finance, own, construct, lease, operate, dispose of and otherwise deal with certain real property located at and known as 21 Martin's Cove Road, Hingham, Massachusetts, and the building thereon (the "Property"), and to engage in any and all activities which are necessary or incidental to said purposes.

The Partnership shall not engage in any other business without the prior written consent of all the Partners.

Section 1.3  <u>Term</u>

The term of the Partnership shall continue until terminated pursuant to Section 7.1 hereof.


<u>ARTICLE II</u>

<u>CONTRIBUTIONS TO CAPITAL</u>

The Partners have made or shall make the following contributions to the capital of the Partnership upon the following terms and conditions:

Section 2.1.  <u>Contributions to Capital</u>

As of the date of this amendment, each of the Partners has contributed to the capital of the Partnership the amount set forth opposite his name in Exhibit A hereto and each Partner agrees to contribute to the capital of the Partnership in the future any amounts set forth opposite his name in Exhibit A hereto.  Such contributions may be prepaid in whole or in part at any time without premium or penalty.  The Partnership Interest allocable to each Partner shall be in proportion to his paid-in capital.

Section 2.2.  <u>No Interest on Capital</u>

No interest shall be paid on capital contributions or on balances of capital accounts.

Section 2.3.  <u>Withdrawals and Return of Capital</u>

No Partner shall have the right to withdraw or reduce his contributions to the capital of the Partnership except as a result of the dissolution of the Partnership or as otherwise provided by and in accordance with law.  Except as otherwise provided herein, no Partner shall have the right to demand or receive property, other than cash, in return for his capital contribution or have priority over any other Partner, either as to the return of contributions of capital or as to profits, losses, or distributions.  Funds provided to the Partnership by the Partners, other than capital contributions, shall be repaid, together with interest thereon at an annual rate equal to the "Base Rate", so-called, of the First National Bank of Boston then and from time to time in effect, and any borrowing costs which the Partner incurs in providing such funds, or as otherwise agreed upon by the Partners; and, prior to any distribution of any funds to the Partners, from any source.

Section 2.4.   Loans to be Procured by Partners

The Partners agree that it may be necessary to loan or cause to be loaned to the Partnership certain funds for Partnership purposes and that any such loan so made pursuant to this Section 2.4 shall be evidenced by promissory notes, which may be secured by property of the Partnership but which shall be otherwise without recourse to the Partnership and which shall be repayable by the Partnership as a first priority prior to any other distribution to any Partner as such from any source whatsoever.

Section 2.5.   Additional Capital Contributions.

The Partners unanimously agree that, upon the contribution of additional capital by one or more Partner(s), the Partnership Interest(s) of the Partner(s) contributing such additional capital shall be adjusted to reflect the additional contribution of capital as follows:  The Partnership Interest of each contributing Partner shall be made equal to the ratio which all Capital Contributions made by such Partner (including the additional Capital Contribution made pursuant to this Section 2.5) bears to the aggregate of all Capital Contributions made by all Partners (including the additional Capital Contribution made pursuant to this Section 2.5); and the Percentage Interests of any non-contributing Partners shall be decreased proportionately.

## ARTICLE III

### ALLOCATIONS AND DISTRIBUTIONS

Section 3.1.   Allocations

(a) Profits and Losses Defined.  The terms "profits and losses" shall mean the Partnership's annual net profits or losses as determined for each fiscal year by the Partnership's accountant in accordance with accounting principles used in the industry and as reported for Federal income tax purposes.

(b) All profits, losses and tax credits shall be allocated to the Partners in proportion to their respective Partnership Interests as set forth in Exhibit A hereto, except as may be otherwise required under Sections 704 and 725 of the Internal Revenue Code and regulations promulgated thereunder.

Section 3.2.   Distributions

(a)  After payment of all other Partnership obligations, all cash available for distribution shall be applied and distributed as follows:

- 3 -

First, to the repayment of any outstanding loans made by any Partners;

Second, the balance, if any, shall be allocated among the Partners in accordance with their partnership interests as set forth in Schedule A.

All distributions to the Partners shall be shared by each Partner in the ratio of his paid-in capital contribution to the paid-in contributions of all Partners.

(b)  If any Partner shall reside in the Property, he shall be obligated to pay any real estate taxes and assessments and water and sewer charges and utility costs in connection therewith.

(c)  If the Partners determine that the proceeds available to the Partnership exceed the cost of all capital costs required in connection with the maintenance of the Property annually, such excess shall be distributed as a special distribution to Suzanne Wright and treated as a distribution pursuant to Section 731 of the Internal Revenue Code.

<u>ARTICLE IV</u>

<u>RIGHTS AND POWERS OF THE PARTNERSHIP</u>

Section 4.1.  <u>General Powers</u>

Subject to any specific limitations set forth in this Agreement, the Partnership shall have the following powers:

(a) To acquire real property by purchase or lease and to finance, construct, own, lease and operate the Property and to pledge, transfer, sell, or exchange all or part of its interest in said Property;

(b) In furtherance of paragraph (a), to obtain financing for the acquisition and construction of the Property, and from time to time to refinance the same, and to mortgage all or a part of the property of the Partnership to secure the repayment of such financing; and in furtherance thereof, from time to time to enter into and to execute and deliver one or more promissory notes, a mortgage and security agreement and all such other agreements, instruments, and documents as may be necessary or appropriate in connection with the financing or refinancing of the Property;

(c) In furtherance of paragraph (a), from time to time, to enter into and to execute and deliver leases with respect to the Property and to enter into and to execute and deliver all

- 4 -

28105

such other agreements, instruments, and documents as may be appropriate in connection with the acquisition, construction, financing, leasing and operation of the Property;

(d) To acquire, by purchase or otherwise, any personal property necessary, convenient, or incidental to the accomplishment of the purposes of the Partnership; and

(e) To enter into, perform, modify, supplement or terminate any contract necessary to, in connection with or incidental to the accomplishment of the purposes of the Partnership.


## ARTICLE V

## RIGHTS, POWERS AND OBLIGATIONS OF PARTNERS

Section 5.1.  Managing Partner

a)  The powers and duties of the Partners to conduct the business of the Partnership hereunder shall be vested exclusively in the Managing Partner who subject to the terms and provisions of this Agreement shall have the sole authority to act on behalf of the Partnership.  The initial Managing Partner shall be Suzanne Wright.  In the event of the death or retirement of Suzanne Wright, or should Suzanne Wright be unwilling or unable to serve as Managing Partner, Meara shall become Managing Partner.  If Meara shall be unable or unwilling to serve as Managing Partner, Wright shall be the successor Managing Partner, but if she shall be unable or unwilling to serve, the then Partners shall choose a Successor Managing Partner.

b)  No Managing Partner may, without the written consent of all the Partners

(i)    except for bona fide emergency repairs, expend more than $500.00 for routine repairs, improvements and maintenance;

(ii)   incur any further debt or encumbrance on the property;

(iii)  terminate the Partnership;

(iv)   confess a judgment against the Partnership; or

(v)    perform or suffer any act which would substantially alter the nature of the business of the Partnership.

Section 5.2  Action by Managing Partner

(a)  Subject to the terms and provisions of this Agreement, the Managing Partner shall have all powers necessary,

- 5 -

2610S

convenient or appropriate to carry out the purpose and business of the Partnership referred to in Section 1.2, subject only to the limitations specifically set forth in this Agreement. Subject to Section 5.1, the Managing Partner shall have the exclusive management and control of the business of the Partnership.

(b)  Without limiting the generality of the foregoing, the Managing Partner is hereby authorized and empowered on behalf of the Partnership to carry on any activities necessary to, or in connection with, or incidental to, the accomplishment of the purposes of the Partnership, so long as such activities may be lawfully carried on or performed by a partnership under the laws of the Commonwealth of Massachusetts.

(c)  Except as specifically limited herein, the Managing Partner shall have the full, exclusive, and complete right to direct and control the business of the Partnership. The Managing Partner has the authority to execute on behalf of the Partnership any checks, documents, agreements, or other instruments.

(d)  Suzanne Wright is hereby designated as the "Tax Matters Partner" of the Partnership for all purposes of the Code and any Treasury regulations promulgated thereunder.

(e) The Managing Partner shall, in his sole discretion, make all elections permitted by the Internal Revenue Code of 1986, as amended.

Section 5.3. <u>Partners' Activities and Contracts With Affiliated Persons</u>

The Managing Partner may contract with "Affiliated Persons" for property or services required by the Partnership. "Affiliated Person" shall mean any person, firm or entity (i) which owns or is owned by a Partner in whole or in part; (ii) which is the parent, subsidiary, or affiliate of a Partner; (iii) in which a Partner has any interest whatsoever; or  (iv) from which a Partner shall receive any remuneration, directly or indirectly.  Neither the Partnership nor the other Partners shall have any rights in or to any income or profits derived from any employment, transaction or other contracts with Affiliate Persons permitted hereby as a result of the partnership relationship created and continued by this Agreement.

2810s

Section 5.4.    Indemnification of Managing Partner

The Managing Partner is hereby indemnified by the Partnership for any act performed by him within the scope of the authority conferred on him by this Agreement, except for acts of willful misconduct, gross negligence, or misrepresentation.

Section 5.5.    Indemnification Among Partners

If at any time there is more than one Partner, each Partner hereby indemnifies and holds harmless each of the other Partners of, from and against any loss, cost or liability incurred by any Partner which is in excess of his or its proportionate share of such loss, cost or liability in connection with or arising from their status as partners from any action taken in their capacity as such partners. All liabilities and obligations of the Partnership shall be borne in proportion to the Partners' interests in the Partnership as set forth in Exhibit A.

Section 5.6.    Liability of Managing Partner

Neither the Partnership nor any Partner shall have any claim against any Managing Partner by reason of any acts or omissions of such Managing Partner provided that such acts or omissions were performed in good faith and in the reasonable belief that the Managing Partner was acting within the scope of his authority under this Agreement and that he was not grossly negligent or guilty of willful misconduct or misrepresentation.


ARTICLE VI

ASSIGNMENT OF PARTNERSHIP INTERESTS AND
SUBSTITUTION OF PARTNERS

Section 6.1.    Prohibited Assignment

No Partner shall sell, transfer, encumber or otherwise dispose (which terms, for the purposes of this Article VI, shall not be deemed to include one or more gifts by any Partner of a portion of his Partnership Interest to his spouse and/or children) of any portion of his Partnership Interest unless he has first offered such portion of his Partnership Interest to the Partnership and the other Partners as set forth in Section 6.2 hereof. Any attempted transfer of any portion of a Partnership Interest made without compliance with the terms of this Section 6.1 shall be void and of no effect.

In no event shall all or any part of a Partnership Interest in the Partnership be assigned or transferred to a minor or

incompetent, and any such attempted Assignment shall be void and ineffectual and shall not bind the Partnership.

Section 6.2.   Offer to Other Partners

The offer required to be made to the Partnership and the other Partners pursuant to Section 6.1 hereof shall be made as follows:

(a)   The Partner proposing to sell or transfer his Partnership Interest or a portion thereof (the "Transferor") shall give notice in writing to the Partnership and each other Partner of his intention to sell, transfer, encumber or otherwise dispose of all or a portion of his Partnership Interest, which notice shall specify the portion to be so sold, transferred , encumbered or disposed of, the name and address of the proposed transferee (if there is any) and the proposed terms and conditions of such sale, transfer, encumbrance or disposition, including the purchase price or other consideration to be given.

(b)   The other Partners and the Partnership (excluding the Transferor) shall have sixty (60) days within which to respond to the offer of the Transferor.  They shall either elect to accept the terms and conditions of the Transferor's offer or notify the Transferor that they decline to accept such terms and conditions.  In the latter case, the Transferor shall be free to transfer the Partnership Interest (or such portion thereof as is specified in the offer) as set forth in said offer, but only in strict accordance with the terms and conditions set forth therein.

(c)   Acceptance of the offer of the Tranferor may be made by the Partnership (excluding the Transferor) or by any number of the remaining Partners.  In the event of such acceptance by the Partnership, the purchase price paid shall be deemed a return of the Partner's capital to the extent of the Transferor's capital account.  In the event of acceptance by more than one of the remaining Partners, they shall be entitled to accept the offer in proportion to their respective Partnership Interests unless they agree otherwise.

(d)   If the Tranferor's offer is rejected by the Partnership (excluding the Transferor) and the other Partners but the Transferor fails to consummate the proposed transaction within ninety (90) days of the notice to the Transferor of such rejection, the limitations of Section 6.1 shall apply as if no notice of the offer was given.

- 8 -

2B10S

Section 6.3    Assignment

In addition to the requirements of Section 6.2, in order for any Partner to assign all or any part of his Partnership Interest to a person who is not already a Partner, he must comply with the following:

(a) the assignor shall, at the request of the Managing Partner, deliver to the Managing Partner an opinion of counsel in form and substance satisfactory to counsel designated by the Managing Partner, that such assignment and any offerings made in connection therewith are in compliance with applicable federal and state securities laws;

(b) the assignee shall execute a statement that he or it is acquiring such Partnership Interest or part thereof for his or its own account for investment and not with a view to the distribution or resale thereof; and

(c) the Managing Partner shall consent to such assignment (which consent may not be unreasonably withheld, except that consent shall be withheld if in the opinion of mutually agreeable counsel such assignment would result in the termination of the Partnership under the Internal Revenue Code of 1986, as amended).

If the foregoing conditions are not complied with, the Partnership need not recognize such assignment for any purpose whatsoever.

Section 6.4.    Provisions Applicable to All Transferees

An assignee of a Partnership Interest who desires to make a further assignment of his interest shall be subject to all the provisions of Sections 6.1, 6.2 and 6.3 to the same extent and in the same manner as any Partner.

Section 6.5.    Rights and Liabilities of an Assigning Partner

Any Partner who shall have assigned his Partnership Interest shall cease to be a Partner of the Partnership and shall no longer have any of the rights or privileges of a Partner, nor shall he have any liability for the obligations of the Partnership incurred after the date of such assignment.

Section 6.6.    Voluntary Withdrawal of a Partner

A Partner may not voluntarily withdraw from the Partnership without the written consent of all of the other Partners. Such Partner's withdrawal from the Partnership shall be deemed to

- 9 -

occur on the date of withdrawal stated in a notice given by him to the other Partners, which date of withdrawal shall be at least thirty (30) days after such notice is given.

Section 6.7. <u>Substitution of a Partner</u>

(a) Subject to the terms of this Section 6.7, upon the death or adjudication of incompetence of any Partner, the legal representatives, heirs or assigns of the Partnership interest of the deceased Partner shall succeed to the interest of the deceased or incompetent Partner, including the share of the capital, profits and losses, and distributions of net cash proceeds which were formerly allocable or distributable to the deceased or incompetent Partner from whom such successor received such Partnership Interest.

(b) In the event of the substitution of a Partner pursuant to Section 6.7(a), the remaining Partners and the substituted Partner shall have the obligation to continue the business of the Partnership employing its assets and name.

ARTICLE VII

DISSOLUTION; DISTRIBUTION UPON DISSOLUTION

Section 7.1. <u>Dissolution</u>

The Partnership shall terminate and dissolve upon the happening of any of the following events:

(a) The withdrawal or Retirement of a Partner, unless within ninety (90) days from the date of the event the remaining Partner(s) elect to continue the business of the Partnership (and in the case of a Retirement pursuant to Section 6.7(a) such election shall be deemed to be duly made).

(b) The determination by the holders of not less than 66.66% of the interests in the Partnership, that the Partnership should be dissolved.

(c) December 31, 2050.

Section 7.2. <u>Distribution on Dissolution</u>

(a) <u>Procedure on Liquidation</u>. Unless the business of the Partnership is continued, upon the termination and dissolution of the Partnership, the Partners or any person elected to perform such liquidation by all of the Partners, or if there is none, such other person required by law to wind up the Partner's affairs, shall proceed with the liquidation of the Partnership,

- 10 -

and the net proceeds of such liquidation shall be applied and distributed in accordance with the provisions of Section 3.2 hereof.

(b) <u>Distribution in Kind</u>. If it becomes necessary to make a distribution of Partnership property in kind, due to the economic impracticability of liquidating the assets of the Partnership, such property shall be transferred and conveyed to the Partners and their assignees so as to vest in each of them as a tenant-in-common an undivided interest in the whole of said property equal to his Interest had there been a distribution of net cash proceeds made in accordance with Section 3.2. hereof.

<u>ARTICLE VIII</u>

<u>BOOKS OF ACCOUNT AND REPORTS: FISCAL MATTERS</u>

Section 8.1.    <u>Partnership Records and Books of Account</u>

(a) The Managing Partner, at the expense of the Partnership, shall at all times keep and maintain complete and accurate books, records and accounts of the Partnership, in accordance with methods of accounting used in the industry, and in a manner and form acceptable to the accountants appointed to prepare the Partnership tax returns.

Said records shall include:

(1)    a current list of the full name and last known business address of each Partner set forth in alphabetical order;

(2)    copies of the Partner's federal, state and local income tax returns and reports, if any, for the three most recent years;

(3)    a copy of this Agreement and any amendments hereto; and

(4)    any financial statements of the Partnership for the three most recent years.

(b) Said books, records and accounts shall be kept at the principal office of the Partnership. All Partners and their duly authorized representatives shall have the right to audit, examine and make copies of the same during business hours.

(c) Said books shall be kept on an accrual basis.

28105

Section 8.2.   <u>Fiscal Year</u>

The fiscal year of the Partnership shall be the calendar year.   Another year may be designated for financial reporting purposes by the Managing Partner.

Section 8.3.   <u>Bank Accounts</u>

The funds of the Partnership shall be deposited in the name of the Partnership.   Each Partner may at any time examine the Partner's bank balances, statements, and accounts.

Section 8.4.   <u>Tax Returns</u>

The Managing Partner will cause to be prepared or reviewed at Partnership expense, by the accounting firm appointed pursuant to Section 8.1(a), appropriate federal, state and local tax returns which shall be submitted to the Partners not more than ninety (90) days after the close of each fiscal year.

<u>ARTICLE IX</u>

<u>AMENDMENTS</u>

This Agreement may be amended only by written agreement of all of the Partners.

<u>ARTICLE X</u>

<u>GENERAL PROVISIONS</u>

Section 10.1. <u>Notices</u>

(a) Any and all notices or other communications required or permitted by this Agreement or by law to be served on or given to any party hereto by any other party hereto shall be in writing, and shall be deemed duly served and given when personally delivered to the party to whom it is directed, or in lieu of such personal service, three (3) days after deposit in the United States Mail, first class, registered, postage prepaid, addressed to the respective Partners at the addresses shown in Exhibit A hereto.   Any Partner may change his address for the purpose of this paragraph by giving written notice of such change to the other party in the manner provided in this paragraph.

All consents required under this Agreement shall be deemed given unless written notice of nonconsent shall have been

- 12 -

received by the Managing Partner within thirty (30) days after
notice of the action requiring such consent has been mailed.

Section 10.2. Governing Law

This Agreement and all amendments hereof and all rights of
enforcement hereunder shall be governed by the laws of the
Commonwealth of Massachusetts.

Section 10.3. Headings

The headings of the sections of this Agreement are inserted
for convenience only and shall not be deemed to constitute a
part of this Agreement.

Section 10.4.  Further and Additional Documents

Each of the Parties hereto agrees to execute, acknowledge
and verify, if required to do so, any and all further or
additional documents as may be necessary to fully effectuate the
terms of this Agreement.

Section 10.5. Counterparts

This Agreement may be executed in counterparts, which taken
together shall constitute a single document.

Section 10.6. Binding on Successors and Assigns

This Agreement shall be binding upon and inure to the
benefit of the executors, administrators, successors, and
assigns of the respective Partners.

Section 10.7. Waiver

The waiver of any breach, item, provisions, covenant, and/or
condition of this Agreement by any of the parties hereto shall
not constitute a continuing waiver or waiver of any additional
subsequent breach, either of the same or of any other additional
or different provision, term, covenant or condition.

Section 10.8. Severability

It is expressly agreed that in the event any court of
competent jurisdiction determines that any provision of this
Agreement is unlawful or unenforceable, then, and in that event,
each and all remaining provisions of this Agreement shall remain
in full force and effect.

28108

Section 10.9. <u>Creditors</u>

None of the provisions of this Agreement shall be for the benefit of or enforceable by any of the creditors of the Partnership.

ARTICLE XI

DEFINITIONS

The defined terms used in this Agreement shall have the meanings specified below:

"<u>Agreement</u>" means this Partnership Agreement, as the same may be amended from time to time.

"<u>Assignee</u>" means the recipient of an Assignment of a Partnership Interest.

"<u>Assignment</u>" means with respect to a Partnership Interest or part thereof, any offer, sale, assignment, transfer, hypothecation, pledge, gift or any other disposition whether voluntary or by operation of law; excluding however, the disposition of a Partnership Interest pursuant to Section 6.7 of this Agreement.

"<u>Entity</u>" means any general partnership, limited partnership, corporation, joint venture, trust, business trust or association.

"<u>Partnership Interest</u>" means the interest in the Partnership held by each Managing Partner in his capacity as Managing Partner, as indicated on Exhibit A, as it may be amended.

"<u>Partnership</u>" means the partnership as formed in accordance with this Agreement, as said partnership may from time to time be constituted.

"<u>Managing Partner</u>" means the person or persons designated as a Managing Partner in Section 5.1 hereto, or any person who becomes a successor Managing Partner as provided herein, in such person's capacity as a Managing Partner of the Partnership.

"<u>Retirement</u>" means in the case of any Partner the death, incapacity, or bankruptcy of such Partner; (a) incapacity shall mean an adjudication of insanity or incompetency; and (b) bankruptcy shall be deemed to occur when such Partner is adjudicated a bankrupt, or if a petition or an answer is filed proposing the adjudication of such Partner as bankrupt, when such Partner shall consent to filing thereof.

- 14 -

"Substitute Partner" means the assignee of a Partnership Interest who is admitted to the Partnership pursuant to this Agreement.

_Suzanne Wright_
Suzanne Wright

_William Robert Meara_
William Robert Meara

2810s

EXHIBIT A

| Partner's Name &<br>Business Address | Capital<br>Contribution |
|---|---|
| Suzanne Wright<br>21 Martin's Cove Road<br>Hingham, MA  02043 | $600,000.00 |

William Robert Meara
21 Martin's Cove Road
Hingham, MA  02040

$ 24,000.00 on 7/1/95
  24,000.00 on or before 12/31/96
  24,000.00 on or before 12/31/97
  24,000.00 on or before 12/31/98
  24,000.00 on or before 12/31/99
  24,000.00 on or before 12/31/2000
  24,000.00 on or before 12/31/01
  24,000.00 on or before 12/31/02
  24,000.00 on or before 12/31/03
  24,000.00 on or before 12/31/04
  24,000.00 on or before 12/31/05
  24,000.00 on or before 12/31/06
  24,000.00 on or before 12/31/07
  24,000.00 on or before 12/31/08
  24,000.00 on or before 12/31/09
  24,000.00 on or before 12/31/10
  24,000.00 on or before 12/31/11
  24,000.00 on or before 12/31/12
  24,000.00 on or before 12/31/13
  24,000.00 on or before 12/31/14
  24,000.00 on or before 12/31/15
  24,000.00 on or before 12/31/16
  24,000.00 on or before 12/31/17
  24,000.00 on or before 12/31/18
  24,000.00 on or before 12/31/19

2810S

# EXHIBIT
# 2

## DECLARATION OF TRUST

This Declaration of Trust made and entered into as of the __17th__ day of __March__, 1995.

## W I T N E S S E T H:

The undersigned SUZANNE WRIGHT, (hereinafter referred to collectively as "Trustee"), do hereby declare that she and her successor in trust will hold all property to be conveyed to them as Trustee hereunder (including without limitation, the property conveyed to them by deeds to be registered or recorded concurrently with the recording of this instrument), upon the terms herein set forth, for the sole benefit of the beneficiaries hereinafter referred to. The Trust is to be called the MARTIN'S COVE REALTY TRUST. No partnership is intended to be created hereby. The purposes for which the Trust is formed and the functions to be carried on by the Trustee are limited to holding the record legal title of the Trust Premises for the benefit of the Beneficiaries. The Trust shall not engage in any functions other than the holding of record legal title to the Trust Premises, and such functions as are necessarily incidental thereto, and is intended to be merely a nominee trust, so-called, for Federal and State income tax purposes.

1.   The beneficiaries of this trust and the respective interests of such beneficiaries are set forth in the schedule of beneficiaries this day executed by the beneficiaries and the Trustee, filed with the records of the Trustee, and a certificate or other writing signed by the then Trustee certifying to the identities of the beneficiaries or stating that any action which has been approved or taken by the beneficiaries shall be conclusive in favor of any person dealing with the Trustee or with any of the trust property, and any such person may rely thereon without further inquiry.

A duplicate original of this Trust is to be recorded in those registries of deeds for the counties or districts in which the Trustee acquires real estate.

2.   The sole powers, duties and authority of the Trustee shall be as follows:

> (a)   To hold real property until the earlier of the following to occur (i) until directed by the beneficiaries to convey title out of the trust, or (ii) until the termination of the trust and thereupon to convey the right, title and interest of the Trustee in said real property, subject to any existing mortgages or encumbrances, to the said beneficiaries, the undivided interest of each beneficiary to be proportionate to his or its respective beneficial interest in the trust, and similarly to distribute any funds or other assets which the Trustee may then have.
>
> (b)   To execute such instruments, including, but without limitation, deeds, mortgages and leases of trust property as the Trustee may be from time to time specifically directed by the persons who at the time may be the beneficiaries of the trust.

- 2 -

(c)   To do any such other things as the Trustee may be specifically authorized or specifically directed to do by the terms of this instrument.

(d)   To take any such action with respect to the trust property as from time to time specifically directed by the beneficiaries.

(e)   To delegate to any person or persons (natural or corporate), including, without limitation, any other Trustee, authority to execute any and all instruments or to do any and all acts which the Trustee are authorized and empowered so to do.

(f)   No person dealing with the Trustee shall be under any obligation to inquire as to the propriety of any action or omission by the Trustee and shall be conclusively protected in assuming without further inquiry that any action by the Trustee, including the execution of any deed, mortgage, lease or other instrument, is valid and duly authorized hereunder.

(g)   Any and all instruments executed pursuant to the foregoing power may create obligations extending over any periods of time, including periods extending beyond the date of any possible termination of this trust.  Notwithstanding any provision contained in this instrument, no Trustee shall be required to take any action which will, in the opinion of such Trustee, involve him in any personal liability unless first indemnified to his satisfaction.

3.   This trust shall terminate on the occurrence of any one of the following events:

(a)   The expiration of twenty (20) years from the date hereof;

(b)   Recordation with the appropriate Registries of Deeds of a notice of termination signed by the Trustee or by all beneficiaries.

- 3 -

4.   There shall at all times be no less than one Trustee and all documents shall be executed by no less than one Trustee.  Any Trustee hereunder may resign by written instrument signed and acknowledged by such Trustee and recorded with the appropriate registries of deeds.

In the event of the inability of SUZANNE WRIGHT to serve as TRUSTEE hereunder, WILLIAM ROBERT MEARA shall serve as successor TRUSTEE.  Other than in this event any successor Trustee shall be appointed by the beneficiaries, and any Trustee may be removed by the beneficiaries.  Appointments and removals of a Trustee shall be by an instrument or instruments in writing signed by the succeeding Trustee or by the beneficiaries provided in each case that such instrument or instruments shall be recorded with said Deeds.  The acceptance in writing by any new Trustee shall also be so recorded.

Upon the appointment of any succeeding Trustee, the title to the trust estate shall, thereupon and without necessity of any conveyance, be vested in said succeeding Trustee jointly with the remaining Trustee, if any.  Each succeeding Trustee shall have all the rights, powers, authority and privileges as if named as an original Trustee hereunder.

No Trustee shall be required to furnish bond.

This Declaration of Trust may be amended from time to time by an instrument in writing signed by the then Trustee hereunder and authorized by the beneficiaries and acknowledged by the then Trustee or beneficiaries, provided, in each case, that the instrument of amendment, or a certificate by the

- 4 -

Trustees setting forth the terms of such amendment shall be recorded with the appropriate registries of deeds.

5.   Every agreement, lease, deed, mortgage or other instrument executed by any person or persons appearing from the records of registries of deeds to be a Trustee hereunder shall be conclusive evidence in favor of every person relying thereon or claiming thereunder, without the necessity of any such person making any further investigation or inquiry, that at the time of the delivery thereof this trust was in full force and effect, and that the Trustee was duly directed by all the beneficiaries to execute and deliver such agreement, lease, deed, mortgage or other instrument.  Any person dealing with the trust property or the Trustee may always rely on a certificate signed by any person appearing from the records of such registries of deeds to be a Trustee hereunder as to who are the Trustee or beneficiaries hereunder, or as to any direction by the beneficiaries, or as to the terms of the Declaration of Trust or any amendment thereof, or as to the existence or non-existence of any fact or facts which constitute conditions precedent to any action by the Trustee or which are in any manner germane to the affairs of the trust. The termination of the trust shall not be deemed to restrict the power and authority of the Trustee or to transfer and convey all property held by them to the beneficiaries.

- 5 -

6. No Trustee hereunder shall be liable for any error of judgment nor for any loss arising out of any act or omission in good faith, but shall be responsible only for their own willful breach of trust.

WITNESS the execution hereof, under seal, as of the day and year first above written.

_____
SUZANNE WRIGHT


COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS                    _____March 17_____, 1995

Then personally appeared the above named SUZANNE WRIGHT and acknowledged the foregoing instrument to be her free act and deed, before me,

_____
NOTARY PUBLIC - John F. Elliott, Jr.

My Commission Expires: January 3, 1997

- 6 -

## SCHEDULE OF BENEFICIARIES

I, SUZANNE WRIGHT, being the Trustee of Martin's Cove Realty Trust u/i/d March 17, _____, 1995, state that the beneficiaries of the trust and their interest therein are as follows:

MARTIN'S COVE REALTY COMPANY                    100%


Dated this _17th_ day of March_____, 1995.


                                  _____
                                  SUZANNE WRIGHT


- 7 -

# EXHIBIT
# 3

### *QUITCLAIM DEED*

I, SUZANNE WRIGHT, of San Jose, California, as TRUSTEE OF THE MARTINS COVE REALTY TRUST, under Declaration of Trust, dated March 17, 1995, filed as document #380556 in the Registry District of Plymouth County, for consideration of SIX HUNDRED THOUSAND DOLLARS ($600,000) and other good and valuable consideration paid, grant to WILLIAM ROBERT MEARA having an address of 21 Martin's Cove Road, Hingham, Massachusetts, with QUITCLAIM COVENANTS, that certain parcel of land in said Hingham now known as an numbered 21 Martin's Cove Road, and bounded and described as follows:

SOUTHEASTERLY      by Martin's Cove Road three hundred five and 45/100 (305.45) feet;

SOUTHERLY      by land now or formerly of Elizabeth A. Mason about two hundred forty-five (245) feet;

NORTHWESTERLY      by Hingham Harbor; and

NORTHEASTERLY      by Lot 7 on the plan hereinafter mentioned by a line running through the middle of twelve (12) foot Way about two hundred forty-five and 36/100 (245.36) feet.

Said parcel is shown as Lot 6 on subdivision plan #13575(B), drawn by Lewis W. Perkins, Engineer, dated February 25, 1946, and filed with Certificate of Title No. 4304.

The above-described land is subject to and has the benefit of the restrictions, reservations, rights and easements as set forth in a certain deed from Helen F. Walker to Paul H. Thibodeau et ux., dated July 21, 1949, filed as document #32087.

Said land is also subject to any rights acquired by the Town of Hingham by reason of a taking, dated April 13, 1945, filed and registered as document #28908.

Witness my hand and seal this __11__ day of March, 2003.

_Suzanne Wright_
Suzanne Wright, Trustee of Martins Cove Realty Trust

## STATE OF CALIFORNIA

Santa Clara County, ss

March 11, 2003

The personally appeared the above-named SUZANNE WRIGHT, AS TRUSTEE OF MARTINS COVE REALTY TRUST, and having been duly authorized by said Trust, acknowledged the foregoing to be her free act and deed, and that of the Trust, before me.



STANLEY L. BARTELMIE
Commission # 1320788
Notary Public - California
Santa Clara County
My Comm. Expires Oct 11, 2005

Notary Public
My Commission Expires 10/11/2005

2

# EXHIBIT
# 4

6cc

# South Shore
## Home

# Paradise found at Wo

**By Lauryn Mittleman**
CORRESPONDENT

It is coming. For the record, summer officially starts Saturday. So let's ring it in right featuring a property that maybe isn't officially, but one which very well could be the most coveted, captivating piece of land in all of Hingham.

This week we're talking World's End waterfront, so sit back and marvel at these numbers. For a $3 million-plus asking price, just in time for summer you could have your very own 300 feet of water frontage, two acres of picture-perfect landscaping, a 60 foot dock, one mooring, and topping it all off, a private beach when the tide's out.

Magnificent no matter what the season, strolling the property on a sunny June day particularly feels like a step onto a movie set, or into a romance novel. Awakening all senses, the grounds are an intoxicating mix of mature plantings (including flower beds and one massive copper beech tree the kids are sure to want to climb). Standing still you'll hear nothing but the quiet chirp of a shore bird and maybe some rustling on the flagpole. Meanwhile, in the not so far distance your eyes will be entertained by a wealth of action in the channel, what with the never-ending parade of boaters and watercrafts passing through. In the end, "I think it's absolutely the



**A wall of windows**

best lot in all of town," offers Listing Agent and Hingham resident Patty Byrne.

From there Byrne goes on to



COHASSET - A much desired location & terrific ocean views from this four bedroom, four bath home just off Atlantic Ave. Views to the North Shore from the exquisite master suite. 2 levels of decks & glass-walled breakfast room overlook delightful gardens. **$1,495,000**

**COASTAL COUNTRYSIDE PROPERTIES, LLC**
781-749-4004    781-383-9922
*Exclusive Sotheby's Affiliate*
www.coastalcountryside.com



**#1 Century 21 in Massachusetts**



**LOANSNAP.COM**

**Mortgages. Fast. Local. Online.**

- Low Rates
- No Application Fees
- Free Preapprovals
- Apply Online

Toll Free
**888-839-9990**

MA Mortgage Broker #MB1787

## Real Estate
### Portrait

# rld's End in Hingham



PHOTOS/LAURYN MITTLEMAN

the living room looks out over the water.



Wall to wall carpeting gives the bedroom a luxurious feel.

inform that World's End neighbors additionally enjoy privileges such as access to Martins Cove Association beach, and of course the area's namesake conservation land. And finally, should there be a wedding in your future, no need to look any further for a location adds Byrne as it would be a pleasure to raise a tent at the center of your home-base and natural paradise. So, although residing here you might feel you needn't ever go indoors, when the time does come a charming Royal Barry Wills designed classic Cape is waiting for you, offering up spectacular views of the inner harbor and the Boston skyline from nearly every room. What's more, should the home as it stands not quite suit your size needs, here new buyers are also free to expand in any direction they can imagine as their new lot certainly allows for it.

The home's roomy entry foyer is where visitors are afforded their first memorable glimpse at the water views to come as the area next opens gracefully to the living room. There, spreading out over 33 by 14 square feet of floor space we feast our eyes on not only a wealth of picture windows, but elegant built-ins and a handsome fireplace too. Here, homeowners are also given their choice of either keeping the existing plush carpet underfoot, or exposing homewide wood flooring.

If the summer heat ever actually gets here, you'll be pleased to learn this Cape already comes with central air conditioning. What's more, also thinking ahead to summer, come July 4th you won't need venture any further than the family room which comes next to enjoy Hingham's pyrotechnics. Perhaps you'd rather return outside to the grounds for the absolute best seat in town. However, here in the family room views are once again glorious. To its credit, this space could also serve as a bedroom as it comes well closeted and additionally features fashionable paper, plus an alcove tailor made for a computer station. What's more, should you decide to employ it as a bedroom, the area's full bathroom comes in handy. And still the tour of the tucked away wing located to the first floor's left doesn't end there as next we're in store for both a second bedroom option (currently in use as the master), as well as an intimate study. Situated to the right of the foyer the den is a welcoming space indeed, where to enjoy a good read, and here your literary selections are all

SEE NEXT PAGE



full bath "Matthews".
ced yard with gunite
chnroom. Large deck,
ural vacuum - all the
sq. ft. of living space
or level. House is set
end of cul-de-sac.

Advisors
999



The rear of the house boasts a spacious lawn.



The gently sloping grounds lead out to the water.

419,900
at its Best!
this delightful, sunny Ranch.
gorgeous grass lawn, gardens
lined home boasts an open &
lpl, DR, EIK, sun rm, great
is a Wonderful Life!"



D GABLES
GROUP, INC.
GrandGables.com



HINGHAM
Open House, Sunday, June 22~12-4
190 Hull Street



# Homebuying workshop features down-payment grants

Neighborhood Housing Services of the

South Shore is offering a free First-time

Homebuyer Workshops during the month of June.

There will be a workshop Saturday, June 21, at Quincy President's Place, 1250 Hancock St., Quincy, in collaboration with GMAC. The one-day workshop will run from 9 a.m. to 4:30 p.m. Breakfast and lunch will be provided.

options, legal aspects of the homebuying process, how a home inspection works and other presentations from real estate related professionals. Down-payment grants up to $10,000 per family are available. Participants must complete this workshop to qualify for grant programs. Advance regis-



GRAND GABI
REALTY GROUP, II
(781) 545-5155 Granda

We Have Merged South Shore & Walker Bros.

781-934-2500
Duxbury

781-837-2882
Marshfield

• Close to Wampanuck Park
  commuter boat, shopping
• Convenient to Harbor,
  wooded lot

"It's a Wonder
bsmt, gar, hrdwds & newer septic.
airy fir plan with 3BR, 1.5BA LR, with fp, DR, eatk,
and shade trees, this meticulously maintained home boa
Located on a stunning country parcel with gorgeous grass

South Zone B  communityclassifieds        Wednesday, June 18, 2003    7cd

# ore Real Estate

## New to the Market

| PRICE | TOWN | STYLE | BR/BA | PHONE |
|-------|------|-------|-------|-------|
| $619,000 | Easton | Colonial | 4 | 2.5 | 508-230-8600 |
| $609,000 | Easton | Colonial | 1 | 1.5 | 508-230-8600 |
| $795,000 | Easton | Colonia | 3 | 2.5 | 508-2709600 |
| $244,800 | Easton | Townhouse | 1.5 | 508-230-8600 |
| $659,000 | Easton | Colonial | 3 | 2.5 | 508-230-8600 |
| $225,000 | Halifax | Townhouse | 3 | 1.5 | 781-294-1142 |

# Paradise found at World's End

FROM PAGE 6

close at hand thanks to the room's floor-to-ceiling built-in bookshelves.

OK, so what about the kitchen? Well, what about chef approved amenities such as double ovens and a separate one for warming, a stove with Jennaire, a center isle and separate butler's sink. And while one

might wish to make it over to suit their specific needs, the space is absolutely already appetizing thanks to its accommodating work space, classic country look and those inspiring views.

When the day is done, those who have selected the home's two second floor sleeping options will retire to their spacious rooms of hard-

wood floors found beneath the existing carpet, and soothing scenes through the windowpanes to relax them into slumber. (Another full bath is also located here, along with ample storage.)

Oh, and one last thing — residents retiring for the night are advised to settle in just in time for sunset, perhaps curling up in a chair by the

window to watch as the setting sun transforms the entire sky before

them into a breathtaking combination of Mother Nature's finest colors.

## ■ DETAILS

Listing Office:
Hingham Centre Ltd. (781) 749-3650
Listing Agent: Patty Byrne
Listing Address:
21 Martins Cove Road,
Hingham, Mass.
Rooms: 7  Bedrooms: 4
Septic: Private, Title 5 Approved
Listing Price: $3,250,000

ALNUT CREEK
Community



# EXHIBIT
# 5

Plymouth Registry District

54270

Received for Registration

29 AUG 2003

03:55PM



(Reg only)

1) 163054

2) 165 -
1-pg-2

3) 10,992.22

104/018 - 360)/13

## *QUITCLAIM DEED*

I, WILLIAM R. MEARA, of Hingham, Massachusetts, for consideration of TWO MILLION EIGHT HUNDRED FIFTY THOUSAND EIGHTY EIGHT DOLLARS ($2,850,088.00) and other good and valuable consideration paid, grant to MICHAEL G. SMITH and ELIZABETH J. SMITH, Husband and Wife, as Tenants by the Entirety, having an address of 58 Cottage Street, Hingham, Massachusetts, with QUITCLAIM COVENANTS, that certain parcel of land in said Hingham, Plymouth County, Massachusetts now known as an numbered 21 Martin's Cove Road, and bounded and described as follows:

| | |
|---|---|
| SOUTHEASTERLY | by Martin's Cove Road three hundred five and 45/100 (305.45) feet; |
| SOUTHERLY | by land now or formerly of Elizabeth A. Mason about two hundred forty-five (245) feet; |
| NORTHWESTERLY | by Hingham Harbor; and |
| NORTHEASTERLY | by Lot 7 on the plan hereinafter mentioned by a line running through the middle of twelve (12) foot Way about two hundred forty-five and 36/100 (245.36) feet. |

Said parcel is shown as Lot 6 on subdivision plan #13575(B), drawn by Lewis W. Perkins, Engineer, dated February 25, 1946, and filed with Certificate of Title No. 4304.

The above-described land is subject to and has the benefit of the restrictions, reservations, rights and easements as set forth in a certain deed from Helen F. Walker to Paul H. Thibodeau et ux., dated July 21, 1949, filed as document #32087.

Said land is also subject to any rights acquired by the Town of Hingham by reason of a taking, dated April 13, 1945, filed and registered as document #28908.

Witness my hand and seal this 29 day of August 2003.

William R. Meara

### COMMONWEALTH OF MASSACHUSETTS

Plymouth County, ss                                                     August 29, 2003

The personally appeared the above-named WILLIAM R. MEARA and acknowledged the foregoing to be his free act and deed, before me.

Notary Public
My Commission Expires

STUART W. IVIMEY
Notary Public
My Commission Expires
August 15, 2008

# EXHIBIT
# 6

Bk 17985 Pg241 #102767
09-04-2003 & 12:46p

## MASSACHUSETTS QUITCLAIM DEED

Cendant Mobility Financial Corporation, a Delaware corporation, whose address is 40 Apple Ridge Rd., Danbury, CT 06810,

for consideration paid of Eight Hundred Eighty Five Thousand and 00/100 ($885,000.00) Dollars

grant to William R. Mezra and Brenda J. Mezra, Husband and Wife, Tenants by the

of Entirety

190 Plume Avenue, Barnstable, MA

with Quitclaim Covenants,

That certain parcel of land together with all buildings thereon,

See Exhibit A Attached

Being the same premises conveyed to Grantors by Deed of _____

dated and recorded at the _____ Barnstable _____ District Registry of Deeds in

Book _____, Page _____.

WITNESS my/our hand(s) and seal this __29th__ day of __August__ .2003
200xxxx

Cendant Mobility Financial Corporation

By: _____
Closing Agent

State of New Jersey

County of Burlington Date: 8/29/03

Then personally appeared the above named _____ Ann Izzi ;
Closing Agent for Cendant Mobility Financial Corporation and acknowledged the foregoing
instrument to be their free act and deed, before me, on this __29th__ day of
__August__ , 200_3_ .

_____
Notary Public

LEE A. BELL
NOTARY PUBLIC
ATLANTIC COUNTY, NJ
My commission expires _____
Burrow Closing Management Corp.
Phone 800/900-3886 x 71938

FEE $3026.70

CASH $3026.70

## EXHIBIT A

The land, with the buildings thereon, situated in Barnstable (Marstons Mills), Barnstable County, Massachusetts, bounded and described as follows:

LOT 10 as shown on a Plan of Land named "Subdivision #762 "DEFINITIVE PLAN" Open Space Subdivision Herring Run At Indian Lakes in (Marstons Mills) Barnstable, Mass., For Indian Lakes Development Trust & Frances R. Pittendreigh Trustee, Scale 1" = 60', Date: July 30, 1997, Baxter & Nye Inc. Registered Land Surveyors Civil Engineers, Osterville, Mass." which plan is recorded in Plan Book 537, Page 61.

Said premises are conveyed together with a right to use the streets and ways as shown on said plan for all purposes for which streets and ways are now or may hereafter be used in the Town of Barnstable, but reserving to grantor the right to use said ways for all said purposes and to grant rights to others to use said ways and relocate said ways, provided said relocation does not encroach on said lot or prevent the owner of said lot from reaching a public way, and which said reservation includes grantor's right to locate ways within the open space shown on said plan subject to Planning Board approval in order to connect said ways to adjoining land which grantor may acquire in the future.

There is also granted, as appurtenant to said LOT 10 a right of way in common with others now or hereafter legally entitled thereto, over Flume Avenue and Mistic Drive as shown on the plan of land entitled "'INDIAN LAKES ESTATES' Subdivision plan of land in (Marstons Mills), Barnstable, Mass. for A.D. Maddalena, Jr. & James J. Cannon Scale: 1" = 100', April 7, 1966, Revised May 11, 1966, Mener Engineering Corp., South Yarmouth, Mass." duly filed in Plan Book 203, Page 53 of the Registry of Deeds for Barnstable County. Said right of way is to be used for ingress and egress from said LOT 16 to and from the Marstons Mills-West Barnstable Road (Mass. Route 149), and to and from the private beaches "A" and "B", all as shown on the aforementioned plan of land recorded in Plan Book 203, Page 53. There is also granted, as appurtenant to said LOT 10, a right of way, in common with others now or hereafter legally entitled thereto, over Middle Pond Path as shown on the aforesaid plan of land recorded in Plan Book 203, Page 53, said right of way to be used in conjunction with the right of way granted in the preceding paragraph of this instrument.

NO RIGHTS ARE GRANTED IN HAMBLIN POND WAY, shown on the plan recorded in Book 203, Page 53.

Reserving to the Grantor the right to install and maintain all public utilities, in, over, under, along and upon the private ways as shown on said plan; reserving also to the grantor the right to grant easements to public service corporations for the installation and maintenance of such public utilities in, under and upon said private ways, and anchors and guys to support the lines in said private ways and on land adjacent thereto; reserving also to the grantor the right to grant easements to public service corporations for the installation and maintenance of necessary equipment in, under and upon strips of land ten feet in width abutting said private ways on said plan; reserving also to the grantor the title

1

Bk 17585 Ps243 #102767

to all public utilities on said premises and private ways.

Said premises are hereby conveyed together with the right to use the "Open Space" designated as Lot B as shown on the plan recorded at Plan Book 537, Page 51 for recreational purposes, subject to such rules and regulations as the Trustee of Herring Run At Indian Lakes Homeowners Association Trust may at any time and from time to time specify. The grantee, or his successors and assigns by virtue of the ownership of said lot, shall become a beneficiary of the Herring Run At Indian Lakes Homeowners Association Trust subject to the terms and conditions as set forth in the aforesaid Trust, the primary purpose of which Trust shall be to hold legal title to, control and maintain the Open Space shown on the aforementioned plan. Said Open Space Trust being dated November 14, 1997 and being recorded in Book 11065, Page 137.

By acceptance of this deed, the Grantee, his successors and assigns shall be bound by the terms and conditions of the Herring Run At Indian Lakes Homeowners Association Trust including the obligation to pay such amount as shall be assessed against said lot by said Trustees pursuant to the by-laws of said Herring Run At Indian Lakes Homeowners Association Trust.

The owner of said lot shall be personally responsible for any amounts assessed against said lot during the period of his ownership of said lot, said assessment shall be a lien on said lot and shall be collected and enforced in the same manner as the lien for common area charges of a condominium as set forth in Massachusetts General Laws Chapter 183A. A certificate signed by any one of the said Trustees of the Herring Run At Indian Lakes Homeowners Association Trust that all assessments have been paid in full shall be conclusive evidence that there is no lien against said lot for any assessed and unpaid charges for the period described in said certificate.

The premises are subject to and have the benefit of the provisions of a Special Permit from the Town of Barnstable Planning Board recorded with said Registry of Deeds in Book 11065, Page 108 as modified by the decision of said Planning Board recorded in Book 11462, Page 152.

The granted premises are conveyed subject to the provisions of the Declaration of Protective Covenants, Restrictions, Rights and Reservations Governing "Herring Run At Indian Lakes" dated June 17, 1999 and recorded with said Registry of Deeds in Book 12347, Page 17. The building plans and site design have been approved and are in compliance with the restriction requirements.

The premises are further conveyed subject to a Development Agreement dated November 3, 1997 and recorded in Book 11065, Page 114; Planning Board Covenant dated November 3, 1997 and recorded in Book 11065, Page 124 as affected by a Release of Covenant dated August 10, 1998 and recorded in Book 11859, Page 223; Planning Board Covenant dated May 11, 1998 and recorded in Book 11604, Page 191 as affected by a Release of Covenant dated August 10, 1998 and recorded in Book 11859, Page 222; Open Space Restriction and Easement dated November 3, 1997 and recorded in Book